Our second case is 24-1799 and there are a number of other related cases, Kipke v. Moore. Mr. Patterson. Morning Your Honors. May it please the Court, Pete Patterson for the Novotny Plaintiffs. Before Bruin, Maryland limited the public carry of firearms to exceptional people. After Bruin, Maryland is now attempting to limit the public carry of firearms to exceptional places, but this is no more constitutional than the pre-Bruin regime and in fact turns the Second Amendment on its head, as Bruin said that individuals have a general right to carry firearms in public locations, places frequented by the general public, subject to limitations and exceptional circumstances. Maryland's law is directly contrary to the principles that underlie the Second Amendment. As this Court sitting on Bank in Bianchi stated, the Second Amendment principally is about the right of people to protect themselves when the government cannot, and that is consistent with the principles that we are offering this Court, but it is diametrically opposed to the principles that Maryland is offering this Court. Maryland says that it can ban firearms in places of public congregation, in places where vulnerable people are present, but if the government is not protecting those locations, those are locations where the need for protection is enhanced, not diminished, and the founders knew this leading up to the founding of this nation, the majority of the original 13 colonies required people to take firearms to places where people were vulnerable and places of public congregation such as churches and other public assemblies. And you're going to get to the specific locations? Yes, I'm starting off on the degree of principles. There are so many specific locations, I'm happy to discuss any particular ones that the Court has an interest in, but Maryland's arguments primarily for most of the locations, they rely overwhelmingly on four post-1868 state laws that were enacted between 1869 and the end of the century. Let me ask you a threshold question then. One of the grounds that's challenged, I believe, is the school grounds, the areas adjacent to a school, like the sidewalk leading up to the school or a playground or something like that. And the Supreme Court has said in all of the cases from hell or on that a sensitive place is a school or a government building, and they've never carved anything out of that. And you have made a facial challenge, not an as-applied challenge. So why would the playground not be considered a school under those pronouncements from the Supreme Court? Yes, and the positions we are arguing are consistent with every word in Heller and Bruin, and I will explain why. What the Supreme Court said is that laws restricting firearms in schools and government buildings are not being called into question by what we're saying were presumptively constitutional. All laws are presumptively constitutional until they're challenged. Those laws weren't at issue. And they said, we'll save the historical justifications for another day. And then in Bruin, some more meat was put on that, where the court rejected some justifications for sensitive places. They said it's not places of public congregation. It can't be any principle that eviscerates the right to self-defense. But they, again, did not define the principles that underlie those restrictions. And what we have- Why wouldn't the playground be part of the school? Well, OK, Your Honor. So now I'm getting to the history with respect to schools, which the Supreme Court has not explored. And what that history shows is that the government has the authority to restrict- Well, my point here with schools and government buildings is that's what they said. And they've said it several times, and they've never said, OK, here's how you're going to do a carve-out, say, in an as-applied challenge. So what authority do we as a lower court have to carve out in a facial challenge some part of a school? Well, my understanding of a facial challenge is what you do is you look at the face of the law, you apply the constitutional test, and you see if it satisfies the constitutional test. And here it does not, because the Supreme Court did not bless any restriction on any part of schools. And what the history shows is that the government could ban students over whom it has in loco parentis authority from possessing firearms at schools. And similarly, with respect to government buildings, the court provided further refinement in Bruin and looked at founding area polling places, legislative assemblies, and courthouses. And the principle that unites those, as we've shown, is government-provided security. And again, that is consistent with the principles that underline the Second Amendment, which state that people have a right to protect themselves when the government cannot. And the other side's attempt to- Why wouldn't the Supreme Court have embraced that principle if that's the foundation in one of these, you know, Heller, McDonald, Bruin, Rahimi? And that doesn't appear anywhere in there as far as I know. It doesn't because it was not necessary to decide those cases. Those were not sensitive place cases. The only holding with respect to sensitive places that the Supreme Court made was in Bruin, where it rejected the notion that any place of public congregation is a sensitive place, and it also rejected the notion that any principle that would eviscerate the general right of public carry is a sensitive place. And so that actually undermines the other side's principles that they offer here because Maryland is very clear. What Maryland says is that people only have a right to carry firearms on streets and sidewalks. They say that all other government-owned property, firearms can be banned. And they make the astounding claim that in public and private property that's open to the public that the text of the Second Amendment does not even reach those locations. So again, this flips Bruin on its head, which said that people have a general right to carry in places frequented by the general public, subject to limitation only in exceptional circumstances. And the Supreme Court did not define- explicitly said in Bruin that we're not defining the scope of sensitive places. We're not saying what the principles are. We're saying here are some that it is not. And what- it is the other side's burden to come up with valid principles to justify their restrictions. And we have offered a principle that we think is both consistent with the history and it's consistent with the principles underlying the Second Amendment. But the court does not need to adopt our principles to rule for us because it's plain that Maryland's principles are invalid. And again, that's what the Supreme Court did in Bruin is it said that New York's principles are invalid. That's enough to invalidate New York's law. We, therefore, don't need to go any further. And with respect to the facial as applied point, I'll note that at JA 70 in the Kipke plaintiff's complaint and the Kipke plaintiffs are the ones that are challenging the school grounds and the government buildings. They explicitly say we're bringing this both facially and as applied. So, it's both a facial and as applied challenge in that circumstance. Can I ask you about a different category?  I mean, there's a virtual potpourri of places that we're trying to sort through.  So, government buildings is the one that I want to focus my attention on. And so, before we even get to the merits of whether or not the tests that are being considered or being suggested by the parties is correct, you have to show that they're standing to raise the challenge. So, my question is with respect to government buildings, what is it in the declarations or elsewhere that suggests that any of the plaintiffs in this case intend to visit any one or more of the government buildings that are issued in the statute? Yes. Again, that's a Kipke plaintiff. So, Mr. Sweeney can correct me if I'm incorrect. But my understanding is that Ms. Kipke says she wants to go to a demonstration on the lawyers mall on the Capitol grounds. And so, the government buildings includes the grounds of the government buildings. And so, that is in the declarations. I believe they started around JA80 and then go on for the next 40 pages or so. Maybe I'll ask your colleague that question, but since he probably has a better verse. So, go ahead. No. Okay. Yes. And so, I also do want to get to the no carry default, which is a very extensive part of Maryland's ban. Explicitly, the academics, Ayers and his co-author who promoted this said that this will drastically expand the places where people can't carry. And this is diametrically, again, opposed to Bruin, which said that people have a general right to carry in places frequented by the general public. Well, but let me ask you about that because the language in Bruin was not intended to be exclusive, right? They had a number of descriptors, schools, government buildings, and the like. But it wasn't intended to be limiting, was it? Well, they had a concluding part of Bruin where it said that people have a right to carry except in exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials. This is at JA70. Just to be clear, is it your view that the places that were described as sensitive spaces or places in Bruin is it? That's the sole places that we look at? No, not at all. Again, our principle, we say that unites these is government-provided security where then the need for self-defense is not present. And I'll give an example. There is a McDonald's in Pennsylvania that was a sensitive place for one day in its history when then-candidate Trump appeared to work at that location. And the Secret Service secured that location. No one could bring firearms into or out of that location. That was a legitimate sensitive place for that one day. So our test is actually very flexible and adapts to whatever the needs are of the moment. And it just makes common sense. And again, it's consistent with the principles underlying the Second Amendment. What this court said in Bianchi is that there are some places that are so sensitive that we don't allow people to engage in armed self-defense because there is a risk that somebody with those arms would unlawfully use force against another person or a government official. So what about the New York City subway system where police patrol? Is that a sensitive space? No, that's not a sensitive space because they're not screening people. If a person can walk into a location unimpeded by a government official with a firearm, that is not a sensitive place because the government then is not protecting that location. And again, the Second Amendment protects the right. As this court said in Bianchi, to provide protection when the government cannot. And in these sensitive places, the notion that someone who would be willing to use unlawful force on another citizen or assassinate a government official is going to be deterred by an additional misdemeanor that would be incurred by taking a firearm into that place is absurd. And so the only thing that ties together the principles underlying the Second Amendment, the principles underlying this nation's history, is that a sensitive place is a place that a government secures. The schools are a separate issue. That is with respect to the school children. The government has in loco parentis authority over those individuals. Let me ask you one question here as your time goes away. I had thought some part of the argument would go to the debate that's ongoing and you can see in the other circuits' opinions a wide divergence of viewpoints on how we are to analyze what is the Second Amendment tradition. Is it tied to 1791? Does it go to 1868? Maybe you can give us 15 seconds on how you view that because that would seem to be fairly significant with some of the locations in this case. So cover 100 years of history in 15 seconds as well. It may take me a little longer than 15 seconds, but I'll do my best. So our view is that 1791, the Third Circuit and Fifth Circuit got that correct. And the reason is the Supreme Court has held one thing with respect to this, and that is it has to be the same with respect to the states and the federal government. Bruin was very clear about that. There are many other cases that are clear about that. So it can't be 1868 for the states and 1791 for the federal government. It's got to be the same. If that's the rule, it makes the most sense to say it's 1791 because that is when the right was adopted. In 1868, it was not a new right that was adopted. It just expanded the scope to which those rights attached. And so, for instance, if we have another state that was added to the union today, we would say, OK, we're still at either 1791 or 1868. We would still be using that version of the right. And I will submit, if I could have just a few more seconds, that it does not make a difference here. And that is shown by the Supreme Court's decision in Espinoza, where the court said that more than 30 state laws passed post-1868 couldn't constitute an early tradition. Here, they principally rely on four state laws that are post-1868. So, these are not representative, they're outliers, and they can't establish an early tradition. All right. Thank you, Mr. Judge. Thank you. Mr. Sweeney? If you could start with the standing question that Chief Judge Diaz asked. Yes, Judge Agee. On Joint Appendix 83, Susanna Kipke's declaration, she talks about attending the public library with her young children. And that's just the kind of example of the broad sweep of this ban on government buildings, where you have unsecured premises owned or operated by the government, where carry has been banned. So I'd like to briefly talk about the public demonstration ban. Well, are the plaintiffs required to allege standing with respect to each category of government buildings in the statute? Well, Your Honor, I don't know that the standing cuts that closely, but we do have as-applied as-facial challenge. We believe that a facial challenge to a broad ban on government buildings under the principle of if the government provides comprehensive security at the building, it is a sensitive place. If they do not, it is not. On an as-applied challenge, as an as-applied challenge, certainly we must establish standing for each category. Now, how you cut and slice those categories is subject, of course, to how you want to do it. But on public libraries, for instance, we clearly have standing on an as-applied basis. On a facial basis, we have standing to challenge all government buildings as sensitive areas unless they are comprehensively secured. Have you made arguments specifically on an as-applied challenge as opposed to a facial? Well, we have in the sense that we have addressed the specific facts of specific plaintiffs in the briefs, but it is broadly a facial challenge, Your Honor. If I may address briefly the public demonstration ban, the judge below correctly enjoined the ban as being unsupported by historical tradition. There is no evidence of founding error bans on the carrying of firearms at public demonstrations, despite the fact that obviously they occurred at the time. We have challenged those and we have standing to challenge those based upon, again, Mrs. Kipke's affidavit at JA 083 that she attends regularly and would not leave the premises if ordered to do so but for the ban and the subject of criminal liability. The state has challenged her standing specifically on the theory that law enforcement have discretion whether or not to order an armed citizen to leave. But that argument frankly proves too much. If that were the case, there would never be a pre-enforcement challenge because law enforcement always have discretion. In any event, Bruin said that the right to public carry cannot be premised upon law enforcement discretion. We have established standing both facially and as applied with respect to the public demonstration. I see my time has elapsed. If there's no other questions in this complicated case, I will sit down. Thank you very much. Thank you, Mr. Sweeney. Mr. Dietrich? May I please the court? In Heller and then in Bruin, the Supreme Court affirmed that there are certain places, sensitive places, where the carrying of firearms may be prohibited. The state of Maryland through longstanding regulations and now the Gun Safety Act of 2023 has stayed true to this nation's historical tradition, which ranges from the founding to reconstruction and beyond. Although the district court correctly upheld locational restrictions at various locations, including parks, healthcare facilities, government buildings, among others, the district court erred in striking down Maryland's private property default rule as well as locational restrictions at places serving alcohol and at public demonstrations. Although this case asked this court to address very specific restrictions, which I'm happy to address on a case-by-case basis or otherwise, it may be helpful to address the larger question lurking in the background, which is what does make a place sensitive? To answer that question, we looked to many sources. First, of course, we looked to Bruin and its text, history, and tradition standard. We looked at that Bruin identified or affirmed . . . The Supreme Court hasn't bothered to say anything other than sensitive places. So, every court that has addressed this is sort of guessing at it. Well, they're evaluating the clues that were left in Bruin first, and first and foremost is that Bruin . . . There are lots of clues in Bruin and Rahimi, and there's kind of one for whatever position you want to take. So you tell us about yours. Well, we start with Bruin. In Bruin, Heller, the Supreme Court affirmed that there is a concept and a tradition of sensitive places. So we start with that premise that they've already done the work for us in establishing that basic tradition. And then we look at the standard that Bruin talked about, and we look to Bruin's affirmation, as we've done here, of five exemplars of schools, government buildings, polling places, courthouses, and legislative assemblies. And looking behind those exemplars, we examine the particular historical statutes. Now, of course, in Bruin, the court did not rely on a plethora of statute. It relied on only a few to support the tradition that it identified. And we can look at the founding era. We can look at the Northampton laws that we inherited from our English tradition. We can look at the Reconstruction era statutes. Well, the court was pretty specific in Bruin that they didn't think much of the statute of Northampton. In fact, they said it was irrelevant to what happened in 1791. I believe they were speaking of the statute of Northampton as the statute of Northampton as opposed to the states that had adopted or inherited that as part of their English common law tradition. And looking beyond that to how that statute and that tradition had been interpreted and had been evaluated and evolved through the Reconstruction era. And we get to the statutes that the state is relying on that we put in our brief from Tennessee and Texas and Georgia, Missouri, and various local restrictions that are in the record that the state has put before this court. And we can talk about 1868 versus 1791. The state's position is that both of those dates are important. 1791 is obviously when the Second Amendment was adopted. But 1868 is when the Fourteenth Amendment was adopted, which of course makes the Second Amendment applicable to the states. And in Bruin, the Supreme Court talks about that the rights are enshrined with the scope that when the people adopted them. And with regard to the Second Amendment as opposed to the states, it's 1868. But we don't have to, I don't believe we have to parse through and say everything here is available and everything here is not available and pick a date and to the exclusion of the others. I think what Bruin establishes that there is a tradition that obviously started at the founding or perhaps before the founding with American history and evolves through that. And so that you have traditions that are in place at the founding and that you have evolving technological changes, societal changes that inform the tradition as it evolves throughout reconstruction and beyond. And what I think the takeaway from Bruin to this point is that they were evaluating the tradition of or laws that restricted public carry wholesale. And what they looked at was that the laws that the state of New York had relied on that restricted carry wholesale were contrary to a prior tradition. And that's what made them invalid was that there was a tradition and that those laws contradicted that earlier tradition and that those laws were struck down contemporaneously with their enactment. What we have in this case is we have laws, Reconstruction Era laws that move with the tradition and restrict at particular places like places, polling places, courthouses, the places of scientific and literary pursuits, public gatherings, racetracks, etc. The ones that were relying on the predecessors of Maryland's restrictions today. There are lots of racetracks and colonial times at the founding era and there's no evidence that any of those restricted firearms. I'm not familiar necessarily with the history of racetracks at the founding. But it's your burden though, isn't it? It's your burden to enlarge what sensitive places are, isn't it? It's our burden to show the tradition and we've done that through the record. But you're trying to enlarge it. You're going down a line. Judge Agee's questioning you about race. You pivot from that. But it's your burden, isn't it? I mean, but the point is, Bruin was just incredibly broad. It would establish that, you know, from the heller that people have a right to protect themselves and carry weapons. I mean, that's what we have to construe by what the Supreme Court said and say, we go back to 200 and some years to figure out what the, these analogs are. And they were pretty broad then. People carried guns in many places. So, so the question is, you're broad and what, why is it sensitive? I guess that's the question. And your worthy colleagues on the other side say it's sensitive in a sense, because maybe, maybe these places shouldn't be places that where there's no protection, then public has a right to protect themselves. And those are places that are where they assume that there is protection by the government. There's no need. Why is that not a sound scenario to understand Bruin? Because it's very difficult to understand Bruin, but we have to do that. But we do as a look back. It's not a look present. It's a look back. And they did name these things, but I don't know what sensitive is, but tell me how you're using the sensitive to broaden it and being your burden. Well, one point that I want to get out is that like going to the baseball game, for example. Right. And baseball, as far as I know, it was invented in the late 19th century and wasn't around at the, at the founding. But games where they played lacrosse and all those kinds of things like that. They're old games. Right. Right. And, and the way that personally, I think about it is what would James Madison think? Would James Madison have tolerated- Be careful. James Madison didn't have Bill of Rights at all. It was, it was Jefferson who persuaded him that every country has to have Bill of Rights. They were finished in, in 1787 in September 17th. It was later on that they came on the Bill of Rights. So we don't know what Jimmy would have said at all. Now there are times I kind of wish we could sit down and talk with him and Jefferson. I don't know what the two mean here. I wish as well. You, you, you invoked the wrong name there in terms of the Bill of Rights was he was, they were done. They were finished. They only did that because they had to do it because people who were the people like Shays' Rebellion- Well, he, he may have had to do it, but he incorporated the words and- But he had to do it because the pressure was the people who had Shays' Rebellion said, look, we have a government, we want to make sure we can have weapons and just in case that government turns on us and that we were able to, I mean, you have to read the broad thing. The Supreme Court sort of read out the militia part of it saying it's an individual right, but words mean something in that sense. But going back to, how do we do that? How do we- Bruin talked about a nuanced approach to places that were not in place in their modern form at the time of the founding. So we're talking about stadiums, museums, healthcare facilities. I understand my friends on the other side can point to a few museums or a few racetracks or, or some gambling facilities at the time of the founding, but they weren't, they weren't prevalent and they weren't in the nature that they are today. Oh, there were lots of gambling houses at the time of the, of the founding. Just like places of alcohol. Nobody had to check their gun when they went into the Raleigh Tavern. But, but, but also think about the, the nuanced approach goes also to what this court talked about in Bianchi, which is the evolution of the types of weapons that were available at the, at the time of the founding. Most guns were long guns. They had, they were muzzle loaded muskets. They had to be loaded to be available for confrontation. You know what the commonality is? They were all lethal. They were all lethal, weren't they? As far as I, yeah, they could kill a person. Right. But they, they couldn't be carried loaded. That's the only thing you worried about as a human being, right? Whether or not you kill, I mean, whether it was a smooth board or whatever it is, they had weapons. Yeah, they're different, but they're all lethal. That's the commonality of it. And Bruins says we go back to the times when lethal weapons could be used to protect yourself. But, but they couldn't be carried for long times loaded. They couldn't be concealed. And so when these types of weapons, as this court talked about. So you think if somebody went into the Raleigh Tavern with a, with a Derringer that that was a burden to them and they'd already put the shot in, they'd already put the powder in. All they had to do was pull back the lever and pull the trigger. Dude, I think that that was a burden on. Well, your point I thought was that, you know, these were predominantly long guns. I don't know how many people carried a long gun into the Raleigh Tavern, but I bet there was a whole bunch of them in there who had pistols of some sort. And from my understanding, the pistols of that era were the same type where they, they couldn't be carried loaded because of the issues of gunpowder corrosion. And that only in the early 1800s did the weapons develop to a point where they were both concealable and they were ready for confrontation. And that's what motivated a lot of the laws with regards to the weapons restrictions that this court faced in Bianchi, as well as the laws for sensitive places for taking into ballrooms and museums and places of social and literary and scientific purposes. And, and I know I've discussed a lot of this in the brief, and I see that my time as I expected is, is getting low. And I'd like to talk a little bit about first of all, to, to the comprehensive government security standpoint or doctrine, I believe that that's terribly ahistorical in the sense that Bruin in the Supreme court and Heller talked about polling places, for example, and use polling places as an exemplar, clear guidance to, to States to say, you can ban people from carrying guns at polling places, but not so under the theory proposed by, by the plaintiffs. Because only if there's comprehensive security, if there's no comprehensive security at polling places in Maryland and the places across the country. So what was a clear, what the Supreme court apparently says is a clear sensitive place is not so under that theory. And it's terribly ahistorical because now you can take a place that is not a sensitive place or would otherwise not be a sensitive place, but make it a sensitive place. And my friend on the other side used the McDonald's in Pennsylvania. And I think that gives away too much because of what, what it says is that any place can be a sensitive place at any time under as so long as the government provides comprehensive security, which can completely blows out of the water, their facial challenge, because you certainly can imagine that any place could be given government comprehensive security. And it's so facto, it's a sensitive place. But going to the particular locations that the district court struck down first with regard to the public demonstration statute, this is not a statute that prohibits firearms at public demonstrations, firearm carried at public demonstrations under a normal statute. If it was a prohibition, someone could carry it. If someone carried a firearm at a public demonstration and nothing happened, they could later be charged with that conduct. If a police officer saw someone carrying a firearm at a public demonstration, they could be arrested on the spot. But under this law, a few things need to happen. The police need to see a firearm, which is sort of contrary to the whole concealed carry regime. And then they need to tell that person that one, a public demonstration is occurring. So there's notice. And then they need to tell the person that they, uh, that they have to leave and put the gun away. And so under that, under this statute, there's no, uh, the idea that someone is going to be charged with that is, is entirely speculative and standing, uh, falls away. Of course, on the merits, we have the tradition of, uh, prohibiting firearms at public gatherings that are in the reconstruction statutes that we've identified in our, in the record on the, uh, places that serve alcohol. Um, I'll just note that the other two circuits that have addressed this issue, the second circuit in Antonia and, um, the ninth circuit in Walford have said that there is a tradition of restricting firearms. I think at least one of them, maybe both of them said, well, it's a sensitive place because you have intoxicated people there. I don't think there's any founding era, um, support to say that, well, we're going to ban firearms in an area where there are intoxicated people and might ban the sale of alcohol. But I mean, you just, I mean, there were bars everywhere in the founding era. Some of the people on there were drunk, but there's no prohibition on firearms at that time. And so I think what's, what's at play is not only Bruins, Bruins nuanced approach for the, the history that's developed in the interim, but also they identified a, a tradition of restricting, of the deadly mix between firearms and alcohol. And they saw that in founding era statutes that restricted the militia, uh, from selling. And, and I see my time is up, but I can answer the question. So I'll just identify the, or speak on the tradition that's, that's developed in our brief. And that was relied on by the ninth circuit and the second circuit founding era, uh, laws restricting, uh, sales of alcohol near the militia reconstruction and, and antebellum laws that restricted the storage of gunpowder in places that served alcohol laws that restricted intoxicated carry. And finally dead ringers dead ringer statutes from various jurisdictions that actually prohibited the sale of alcohol or prohibited the carry of firearms in places that served alcohol. Thank you very much. Thank you. Mr. Patterson. Yes, sir. Thank you, your honors. I'd like to start with this point about nuance. We don't think this is a case that involves nuance. There's been places from time immemorial of public gathering, public recreation, uh, and there weren't bands there, but to the extent this were a nuanced place that supports us for all the reasons my opposing council States firearms are more concealable. They're deadlier. That means people's need for defense is enhanced in that the government has to do more to keep a firearm out of a place now and actually secure it than they did at the founding. So that's why at the founding, uh, they had things like doorkeepers and sergeants at arms at legislatures. Today, they have the metal detectors we needed to get into this court. And so that's what the government needs to do to make a place secure and to acknowledge it as sensitive. And this really goes to the heart of what the Bruin analysis is and what it said with respect to founding era laws, restricting firearms at polling places, courthouses and legislative assemblies is that we can analogize to those laws. The court wasn't saying that every single instance of those locations is sensitive for all time. It was saying we can analogize to those laws at the founding that restricted firearms at those locations and apply those principles today. And polling places is actually a good example of changed circumstances. We didn't use to have a secret ballot in this country. So there was a big problem with armed intimidation and other tactics trying to get people to vote a certain way. And that was why we had sheriffs operating those polling places as we've shown they're secured. That's why I believe it was in Delaware where there was a restriction on, uh, firearms at or near polling places. But now we have the secret ballot. So that same risk is not present today. And if the place is then not secured, then it's not, it's not a sensitive place today. And so that is, our analysis goes to the heart of what Bruin says is, and Rahimi too, we apply the principles. We don't apply the application of the principles at the founding. We apply the principles to today's facts and also the founding era law restricting firearms at courthouses. I think is very instructive. That was the Virginia Northampton analog that the Supreme Court said this 1786 law practically codified the common law and the common law is a generally applicable law. So we should say, okay, this is a very representative statute. And what that statute did is that it banned only terrorizing carry in most places as Bruin held in fairs and markets and other places. But the first part of that statute said nobody can go armed to courts except the judges and those assisting them. The founders were not fools. They realized that in a sensitive location, we can't put up a sign, enact a statute saying no firearms. If a place was going to be sensitive, the government protected that place. And that is a very clear and objective standard to apply to today. And then I'll say a word about the facial versus as applied issue by saying it's security. We are not giving away the facial challenge. Heller was a facial case and it said the ban on firearm on handguns is facially unconstitutional, even though there are some firearms, if it's possessed by a felon that can be punished or violent felon at least. And it also, if it is an automatic firearm, if it is automatic handgun, Heller suggested that those could be banned, but that didn't get in the way of the facial challenge. And the reason why is the reason why a firearm can be banned is at a, for example, a courthouse is not because it's a courthouse. It's because it's secured. And so that is not in the statute. So the statute, again, putting the face of the statute next to the constitutional analysis, there's no application in which it is constitutional. And even if there were the distinction between a facial as applied challenge is not of some talismanic significance as a Supreme court said in citizens United, it only goes to the scope of the remedy. How does that apply to schools? I'd say schools don't have security necessarily. Well, schools are a different principle. Your honors. I explained it's in loco parentis authority. That's what the history shows. All of the historical bands of firearms at schools were bans on students carrying firearms, reflecting the in loco parentis authority that the schools had over students as explained by the fifth and eight circuits in worth and Reese. And uh, if your honors don't have any additional questions, I ask that all of the bands be invalidated. Thank you. Thank you. Mr. Dietrich. Uh, thank you, your honors. I, I think that, um, I forget who made the point, but I'll make the point again, which is with regard to all of these, uh, principles that the plaintiffs have explained, why didn't the Supreme court just say so if it was government comprehensive security, that was the animating principle, um, for government buildings, courthouses, et cetera. They could have just said so and S and settled this debate once and for all easily. If the school, uh, animating principle for schools was the in loco parentis doctrine, they could have said so very easily. They didn't, they said it unqualified. And therefore, um, that those principles that, uh, my friend from the other side advances should be rejected. I mean, well, there has to be some qualifications. I guess the example that was in Bruin or perhaps elsewhere, what you can't suggest that the whole island of Manhattan is a sensitive place and therefore ban guns in Manhattan, right? So there's some limiting principle and I think we're still struggling, struggling to figure out what that is. So can you help us? Well, I, I would point to that example as, as very instructive in the entire debate, because if, uh, the New York, apparently they took New York as in Bruin, as trying to make, uh, Manhattan, because we all know Manhattan is a, is a very discreet, uh, crowded place, uh, as things go that they wanted to make, they say we can prohibit guns, their carriage of firearms there because it's so crowded and it's a sensitive place. Just like you said, in hell are sensitive places. And Bruin pushed back on that and said, no, no, no, that's, that's getting a too broad a brush of, of prohibiting firearms. But they could have, but, but that was the extreme. New York was sort of taking the extreme view of saying that you could take, make a whole island, a whole city as, uh, as sensitive. But the Supreme court could have rejected that out of hand and said, of course that's ridiculous because there are only these small parts, these, these very few places that are sensitive instead said, Oh, well, you can't, you can't make a whole island sensitive. So we are not trying to make the entire state of Maryland or the city of Baltimore, any place within Maryland, a sensitive place. These are discreet places that are supported by the historical tradition. But when you talk about sensitive, can we just use the word itself? Sensitive? Is it, you know, Heller already said you have a right to protect yourself, right? That that's, and it has nothing to do with any situation about how many people in America kill, you know, people are homicides and things like that. That's out of the question. It said, regardless to all of that, you still have that right. But the sensitive kind of what sensitive is it? Because that's a place where there's, you sense fear. What do you, what do you say? The root word is, you know, sensitive is sense. What is the sense in that place that would narrow the right to carry a gun? What is the sense you're protecting? The person who might be shot by you or was it that, what is it? I mean, because I think that's where you really should start. Since Supreme Court left it vague, you leave with the words they use. They said sensitive. You didn't say protective places as they would say, but what is it? What is it? What do you think that help us with that? What does, what does that mean? I think if we can go out to a wide angle, I think it's places where firearms and, and are not compatible with either the type of place that it is or the people that are there or the activities that take place there. That means a place where you don't have to fear fear for your own protecting yourself. But I don't think that's part of the NASA. I don't think that's why wouldn't it be? Because that's what we're talking about. We're talking about the right to protect yourself. Sensitive places are places where you lose that right to protect yourself. Correct? Because that's the whole point. I'm not, I'm not, I'm not being philosophical. I'm talking about this. I'm trying to find some sense of what the Supreme Court has done in these cases. They're saying you have a right, but we carve out what's sensitive. Is the, is it sensitive because there you don't need to protect yourself or do you might wrong wrongfully? I think hurt someone else. What is it? If we get that, I think we could start understanding rather than trying to be creative. Let's deal with the word that the Supreme Court gave us. It said sensitive. So sensitive must relate to the right that you had. The right was to protect yourself. So this is a place where you don't need to protect yourself. That seemed just as logical as anyone I've heard because otherwise it's not sensitive. I'm scared when I go there, I need a weapon there. I mean, let's give, but I think that's where you can use schools as a good exemplar for, you know, if you want to go to your child's school and they say you can't bring a gun in, do you have to say, well, I need to, I need there to be magnetometers and armed guards everywhere because I have forfeited my right to carry a firearm and I see my time is up. No, please answer. That's the, an exemplar of a place where you give the firearms restricted because you don't want firearms in that place. Even because even if you had, even if you were confronted in a way that you would be, you might otherwise use a firearm, that that would be incompatible with the space and the protection of the people there. You don't want people shooting and, and, uh, you know, in a, in a subway car, you don't want people shooting in a ball, in a crowded ballroom. You don't want people shooting in a museum, things of that nature where the, why not? Why, why, why, why, why shouldn't you shoot there to protect yourself? If someone on the subway pulls a gun and want to kill you, that's, that's when you need one. I don't understand that. I mean, if you ever, that's what I need one. I'm confronted with a whole lot of people. I don't know anything about them. They can jump on and off a train. That's what I might feel. I'm trying to make some logic to what the Supreme Court is saying. That is, that's what I need. One is based on the need and the right to protect oneself. That's what they said. That's what the Supreme Court said. So we're not talking about why, I mean, it's sensitive. Yeah, that's what I needed. I don't need it. Right. That's what we're saying. I need a weapon so I can shoot someone when I needed to protect myself, not unlawfully, not as a marauder, as a defending. So you're saying, look at the subway people being pushed into the, on the rails, uh, rapes and muggings. That seemed like a place you would need a weapon. Why not? Why not? Tell me that. Why not? These are the places where people get killed. They're robbed in parks. You're sitting there trying to read the newspaper and enjoy the birds. And somebody comes along and mug you seem like a place. That's where you need a weapon, right? The state in its police power has decided that, that weapons are incompatible with those places. And that's the way that the state has decided to keep. That's the whole idea about the, about the bill of rights is to protect us against police power. When it overstates a right, that's ensconced in the constitution. It's the second one too, way before the fourth amendment, before the fifth amendment, six, all these powerful, that was second, second, second, only to the right to speak and to assemble and press. The next was, I mean, you gotta, you gotta read it as it is. Now you can't, can't wash away because you disagree with it. That's what the found when they did today, said, no, boom, we need this one right here. I see my time. I see my time has expired. I'm happy to stand up here for as long as, as needed, but if not, I will, but we're not. Thank you. All right. I want to thank, uh, uh, all of the council for their fine arguments in this really difficult and challenging area of the law. We have yet another round coming up, but before we get to that, we're going to come down and greet you and then take a brief recess. Great research. Thank you. Thank you. Thank you. Warm up for the Supreme Court, sir. I'm trying to say that. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  The Honorable, the judges of the United States Court of Appeals in the Fourth Circuit. All right, please be seated. Our third and final case is 24-1886.
judges: Albert Diaz, Roger L. Gregory, G. Steven Agee